**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ELIZABETH DILLARD, | ) | CASE NO. 1:18CV1567 |
| *on behalf of* A.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | JONATHAN D. GREENBERG |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | **MEMORANDUM OF OPINION** |
| of Social Security, | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |

Plaintiff, Elizabeth Dillard ("Plaintiff" or "Dillard"), on behalf of her minor daughter,

A.D., challenges the final decision of Defendant, Nancy A. Berryhill,[1] Acting Commissioner of

Social Security ("Commissioner"), finding A.D. was not entitled to disability benefits under the

Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act").  This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C.

§ 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

# I. PROCEDURAL HISTORY

In April 2005, Dillard filed an application for Supplemental Security Income ("SSI"), alleging A.D. was disabled due to borderline intellectual functioning and developmental coordination disorder. (Transcript ("Tr.") at 19, 107, 163.) In a determination dated August 9, 2005, A.D. was found to be disabled as of March 1, 2005. (Tr. 19, 86.)

A continued eligibility review was subsequently conducted, as a result of which it was determined that A.D.'s condition had improved and she was no longer disabled as of April 1, 2015. (Tr. 19, 86.) This determination was upheld on reconsideration after a disability hearing by a state agency Disability Hearing Officer. (Tr. 19, 105.)

Dillard thereafter requested a hearing before an Administrative Law Judge ("ALJ"). On July 11, 2017, an ALJ held a hearing, during which Dillard and A.D. testified. (Tr. 19, 48-78.) Dillard and A.D. were not represented by counsel and/or a representative during the hearing. (*Id*.) On August 30, 2017, the ALJ issued a written decision finding A.D.'s disability ended as of April 1, 2015 and, further, that A.D. had not become disabled again since that date. (Tr. 19-41.) The ALJ's decision became final on June 5, 2018, when the Appeals Council declined further review. (Tr. 1-8.)

On July 10, 2018, Dilllard filed a Complaint on behalf of A.D. to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 13, 15.) Dillard asserts the following assignments of error:

> (1)  The ALJ's failure to evaluate the impact of Plaintiff's psychotic disorder and Tourette's Syndrome under the Listings of Impairments resulted in reversible error.

2

(2)     Substantial evidence does not support the ALJ's assessment of Plaintiff's functioning in the domains of acquiring and using information and caring for self, and as a result, remand is necessary.

(3)     Remand is warranted for the consideration of new and material evidence.

(Doc. No. 13.)

## II.     EVIDENCE

### A.     Personal Evidence

A.D. was born in November 2003.  (Tr. 25.)  She was one and one half (1 ½) years old when she was when she was initially found disabled in August 2005, eleven (11) years old when it was determined that she was no longer disabled, and thirteen (13) years old at the time of the administrative hearing.  (Tr. 54-55.)  Thus, A.D. was a school-age child as of April 1, 2015 for purposes of social security regulations, and subsequently changed age categories to an adolescent as of the date of the hearing.  *See* 20 C.F.R. § 416.926a(g)(2)(iv) and (v).

### B.     Relevant School Records and Medical Evidence[2]

#### 1.     School Records

On December 2, 2014, A.D.'s intervention specialist, BethAnn Clark, completed a Teacher Questionnaire.  (Tr. 204-209.)  A.D. was in the fourth grade at this time.  (Tr. 204.)  Ms. Clark indicated she had known A.D. for the previous 2 ½ years, and met with her five times per week for 50 minutes each day.  (*Id.*)  Ms. Clark found A.D. had several "obvious problems"[3] in

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

[3] The "rating key" for the Teacher Questionnaire provided the following range of options for rating A.D.'s abilities in certain areas: (1) no problem, (2) a slight problem, (3) an obvious problem, (4) a serious problem, and (5) a very serious problem.  (Tr. 205.)  The specific meanings of these categories are not defined by the Questionnaire.

the domain of Interacting and Relating with Others, and Caring for Herself. (Tr. 205-206.) Specifically, Ms. Clark concluded A.D. had obvious problems in the following areas: (1) interpreting meaning of facial expressions, body language, hints and sarcasm; (2) using adequate vocabulary and grammar to express thoughts/ideas in general everyday conversation; (3) handling frustration appropriately; (4) identifying and appropriately asserting emotional needs; (5) responding appropriately to changes in own mood (e.g., calming self); and (6) using appropriate coping skills to meet daily demands of school environment. (*Id*.) Ms. Clark further noted that intelligence testing from April 2012 revealed A.D. had a full scale IQ of 74. (Tr. 208.) She indicated A.D.'s "current instructional levels" for reading and math were in the "mid 4th" grade level, and in the 4th grade level for writing. (Tr. 204.)

In the narrative sections of the Questionnaire, Ms. Clark noted that A.D. "prefers to keep to herself and work independently at school." ( Tr. 205.) She observed A.D. "has difficulty selecting appropriate vocabulary when trying to tell a story or answer a question." (*Id*.) With regard to A.D.'s ability to cope with stress and frustration, Ms. Clark explained as follows:

> Sometimes [A.D.] becomes frustrated and emotional when schoolwork becomes difficult. I have especially noticed this in math this year. This stress and frustration can affect her whole day. She is learning to use self-calming techniques with some success. She can also become overly anxious and emotional about her ability to complete her homework accurately as well as when she misplaces her schoolwork.

(Tr. 206.) She further noted that A.D. "has occasionally asked to go home" because of anxiety and worry and indicated A.D. "has stomach aches often" and "seems to have a lot of doctor appointments and misses school or leaves early." (Tr. 207.)

In April 2015, A.D.'s school completed an Individual Education Plan ("IEP") Annual Review. (Tr. 242-258.) The IEP noted A.D. qualified for special education services in the first

grade, and was currently participating in the regular 5th grade classroom "except when receiving specially designed instruction (Math and Language Arts) in the Resource Room (50 minutes/day) and Speech/Language Therapy (60 minutes/month)." (Tr. 243.) A.D. was described as a "quiet, sweet girl who is well liked by both peers and staff." (*Id*.) It was noted that A.D. was "very concerned" about her homework, always made sure to ask for it when she missed school, asked appropriate questions when she was struggling, and was "able to focus and participate during large group and small group instruction in math." (*Id*.) Her teachers observed that A.D. had "struggled with some health issues (stomach problems) and anxiety, some of which is related to her health," but found she had "matured and learned the importance of being in school even when she may not [be] feeling 100%." (*Id*.) A.D.'s grades for the first three quarters of the school year consisted of B's and C's in reading and language arts; and a C, D, and B in math. (Tr. 244.) Her social studies, science, art, music and PE grades were A's and B's. (*Id.*)

A.D.'s IEP Annual Review determined she continued to qualify for specially designed instruction, including "daily, small group instruction in reading comprehension, math problem solving and written expression using research based methods which includes reteaching and review." (Tr. 249.) It was further determined that A.D. qualified for speech and language services, including "direct and intensive speech & language services provided in a small group environment." (*Id*.) She also qualified for a number of accommodations, including "directions re-explained, extended time to complete class work, peer assistance, small group instruction, adapted math homework, time out for anxiety (5 minutes)," as well as various testing accommodations. (Tr. 250, 253.)

An IEP Progress Report from May 2015 indicated that A.D. "has already made great progress on her new speech objectives." (Tr. 262.) The Report noted that "given a level 3-6 text read aloud, she can provide the main idea(s) and details with 50% accuracy and instructor assistance" and "can answer questions with great success about the text contents." (*Id.*)

An IEP Progress Report from May 2016 (when A.D. was in the sixth grade) remarked as follows: "[A.D.] has been working extremely hard during the fourth quarter and has been showing improvement. In the resource room on her last 5 assignments her average score is 73%. On her star reading she went from a scale score of 538 to a 576. She needs to continue to work on her higher level comprehension skills and using her passage to assist her answer questions. It is crucial she reads over the summer to prepare herself for 7th grade." (Tr. 265.) A.D.'s math and writing teachers also noted progress. (Tr. 267, 268.)

A.D.'s report card from the 6th grade generally found she was either meeting grade level expectations or progressing towards grade level expectations with assistance. (Tr. 271-272.) However, she was noted as "needing improvement/experiencing difficulty/requiring much assistance" in several specific categories in science, math, reading, and writing. (*Id.*)

The record also contains several state testing results. In Spring 2017 (when A.D. was in seventh grade), she received a score of 691 on her state English Language Arts test. (Tr. 314-315.) This falls within the "Basic" level[4] and indicates A.D. "does not meet standards for English language arts." (*Id.*) There are also several undated state test results in the record. These results show that, in the areas of Social Studies, Math, and English Language Arts, A.D.

---

[4] There are five levels noted on the state testing form: limited, basic, proficient, accelerated and advanced. (Tr. 315.)

scored at the "Limited" (or lowest) level and did not meet state standards for any of these subjects. (Tr. 697-699.)

### 2. Medical Records

On May 20, 2013, A.D. underwent a Mental Health Assessment with licensed social workers Kelvette Beacham, LISW, and Ann Cristian, LISW, at Beech Brook. (Tr. 525-541.) A.D.'s "presenting problems" were identified as defiant behavior, inattention/poor concentration, learning problems, lying, feeling overanxious, sibling conflict, and temper tantrums. (Tr. 525.) On examination, A.D. showed regression, impaired/inadequate insight, and an "anxious/nervous/worried" mood. (Tr. 535-536.) Other mental status examination findings were normal. (Tr. 535-537.) In the narrative portion of this Assessment, Ms. Beacham and Ms. Cristian noted as follows:

> Clt is a 8 year old 3rd grader . . . Clt drifts in and out of the conversation, has poor concentration and focus, and difficulty communicating in the intake because she did not always have the words to say. Clt can become withdrawn or have a tantrum when she does not get her way. Clt has high anxiety. Clt has regressed behaviors in the home and odd behaviors in school (walking on toes, staring off).

(Tr. 538.) A.D. was diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD") and Disruptive Behavior Disorder, not otherwise specified. (*Id*.) Ms. Beacham and Ms. Cristian determined that school based therapy would be appropriate based on A.D.'s "withdrawn behaviors, defian[ce], poor concentration, regressed behaviors, and anxiety." (Tr. 539.)

On September 25, 2013, A.D. underwent an MRI of her brain.  (Tr. 593-594.)  It showed "mild biparietal subcortical white matter, mild prominence of the CSF spaces anterior to the temporal lobes, Dandy-Walker variant."[5]  (*Id*.)

On January 24, 2014, A.D. presented to psychiatrist Peter Golden, M.D., at Beech Brook. (Tr. 543-544.)  At this visit, Dillard stated A.D. "has reported that she 'sees' people at night, people who are not really there."  (*Id.*)  Dillard indicated A.D. "will wake up screaming," and sometimes reports "that she has seen eyes and heads on her sister's dresser."  (*Id*.)  Dillard also reported problems with attention and concentration.  (*Id*.)  Mental status examination findings were normal, aside from A.D.'s reports of visual hallucinations.  (Tr. 544.)  Dr. Golden diagnosed psychotic disorder and ADHD.  (*Id.*)  He summarized his conclusions as follows:

> The patient is a 10 year old female with Psychotic Disorder NOS and ADHD predominantly Inattentive type.  The patient presents today for further diagnostic clarification and possible medication management.  The patient reported episodes of

---

[5]  According to the National Institute of Neurological Disorders and Stroke, "Dandy-Walker Syndrome is a congenital brain malformation involving the cerebellum (an area of the back of the brain that coordinates movement) and the fluid-filled spaces around it. The key features of this syndrome are an enlargement of the fourth ventricle (a small channel that allows fluid to flow freely between the upper and lower areas of the brain and spinal cord), a partial or complete absence of the area of the brain between the two cerebellar hemispheres (cerebellar vermis), and cyst formation near the lowest part of the skull. An increase in the size and pressure of the fluid spaces surrounding the brain (hydrocephalus) may also be present. The syndrome can appear dramatically or develop unnoticed. Symptoms, which often occur in early infancy, include slow motor development and progressive enlargement of the skull.  In older children, symptoms of increased intracranial pressure (pressure within the skull) such as irritability and vomiting, and signs of cerebellar dysfunction such as unsteadiness, lack of muscle coordination, or jerky movements of the eyes may occur. Other symptoms include increased head circumference, bulging at the back of the skull, abnormal breathing problems, and problems with the nerves that control the eyes, face and neck." https://www.ninds.nih.gov.

visual hallucinations. Mother reported that they have been going on for a while but had been worsening until recently. . . . Mother reports that [A.D.'s] reports of symptoms have been inconsistent. However, she has had occasions where she has been and appeared to be legitimately afraid. The etiology at this point is unknown, however, mother does report that [A.D.] has had an abnormal MRI showing a higher ratio of white matter to gray matter. It is unclear as to whether or not this 'structural' abnormality is the cause of these visual disturbances or if they are secondary to a wildly vivid imagination or both. What is evident, at this time, is that at times [A.D.] does appear to be genuinely frightened by these visual disturbances. As such, this clinician has recommended a trial of Risperdal 0.25mg po qPM targeting the psychotic symptoms.

(*Id.*)

On October 13, 2014, A.D. presented to psychiatrist Thomas Eppright, M.D., at Beech Brook. (Tr. 677.) Dr. Eppright noted that, in the past, issues of mood lability, irritability and anger were present, but "when taking medication, [A.D.] does significantly better" with less anxiety and less irritability. (*Id.*) He further noted there were no reported delusions, hallucinations, or paranoia. (*Id.*) Dr. Eppright prescribed Zoloft and Risperdal. (*Id.*)

A.D. returned to Dr. Eppright on December 2, 2014. (Tr. 545.) At that time, she was "doing reasonably well." (*Id.*) Dr. Eppright noted that "some anxiety is seen secondary to school" but indicated there were no reports of delusions, hallucinations, or paranoia. (*Id.*) Dr. Eppright discontinued the Risperdal, and increased A.D.'s Zoloft dosage. (*Id.*)

Shortly thereafter, qualified mental health specialist Felicia Coffman, QMHS, and licensed social worker Leah Schultz, LISW, of Beech Brook conducted an Individual Service Plan ("ISP") Review. (Tr. 556-563.) At that time, A.D. was in the fifth grade and continued to struggle in several areas, including increasing her concentration, decreasing negative attention seeking behavior, and implementing coping skills. (Tr. 556, 558.) She was diagnosed with ADHD and anxiety disorder, not otherwise specified. (Tr. 559.)

On March 23, 2015, Dr. Eppright found A.D. was "overall doing somewhat better" but "still some anxiety at times seen." (Tr. 599.) He noted "no delusions, hallucinations, or paranoia," and a "good response to Zoloft." (*Id.*)

On April 24, 2015, A.D. presented to pediatric neurologist Nancy Bass, M.D. (Tr. 624-626.) Dillard reported A.D. had developed vocal tics and continued to have sleep issues, including waking up screaming and hitting the walls five nights per week. (Tr. 624.) Dillard stated A.D. "sees 'bad stuff' in her dreams and during the day (sees 'mean people')." (*Id.*) Mental status examination findings were normal, including normal attention and concentration and fluent spontaneous speech. (Tr. 625.) Dr. Bass diagnosed sleep disturbance. (Tr. 626.) She recommended "holding off on medication" for the tics, as she believed they were related to A.D.'s sleep issues as well as anxiety. (*Id.*) Dr. Bass advised Dillard and A.D. to follow up with psychiatry and the sleep clinic, and prescribed melatonin before bedtime. (*Id.*)

On May 19, 2015, Ms. Coffman and Ms. Schultz conducted another ISP Review regarding A.D.'s progress. (Tr. 609-616.) They noted A.D. had shown improvement in, or achieved, a number of her goals. (*Id.*) In particular, it was found that A.D. had increased her concentration, decreased negative attention seeking behavior, implemented four coping skills, identified six triggers for her symptoms, learned problem solving skills, improved her mood, and practiced positive self-esteem each week "to help her manage her behavior towards math class and school in general." (Tr. 611-612.) A.D. continued to be diagnosed with ADHD and anxiety disorder, not otherwise specified. (Tr. 600.)

On June 29, 2015, A.D. presented to pediatric gastroenterologist Virginia Baez-Socorro, M.D., for follow up regarding a recent H. Pylori infection. (Tr. 621-623.) At that time, A.D.'s

infection had cleared up but she continued to report daily abdominal pain. (Tr. 621.) She also complained of "a lot of stress and anxiety." (*Id*.) Dr. Socorro noted that "in reviewing notes from [primary care physician] and neurology it seems she also has obsessive compulsive tendencies, anxiety, vocal tics, nightmares and hallucinations, though in clinic today with her Dad her Dad denies this." (*Id.*) Dr. Socorro also noted that A.D. had not been taking melatonin or followed up with psychiatry, as recommended by Dr. Bass. (*Id*.) Dr. Socorro diagnosed probable irritable bowel syndrome ("IBS") and ordered an abdominal ultrasound. (Tr. 623.)

On October 29, 2015, Ms. Beacham conducted an ISP review and found A.D. had made some improvement in her communication, understanding, and coping skills. (Tr. 656.) She concluded as follows:

> Clt is an 11 year old 6th grader . . . Clt continues to struggle with anxiety, moodiness, and sibling conflict. Clt has shown improvement in behaviors and anxiety but continues to struggle in the school setting. [Case Management Team] and clt worked on triggers and coping skills. Clt will continue in therapy services to complete coping skills and manage behaviors. Clt will be discharged once she meets goals and [her mother] is able to get pharm management services in an outside service.

(Tr. 657.)

On May 2, 2016, A.D. returned to Dr. Eppright for follow up. (Tr. 673-676.) He noted that A.D. was "still struggling with depression/anxiety," "some school refusal," and "some magical thinking/scared of dark/scared of being alone." (Tr. 673.) On mental status examination, Dr. Eppright found A.D. was alert and oriented with cooperative behavior, no psychomotor agitation, normal speech, good mood, flat affect, intact memory and attention/concentration, and poor insight and judgment. (Tr. 673-675.) He also noted that A.D. denied auditory, visual, and tactile hallucinations. (Tr. 675.) Dr. Eppright increased A.D.'s Zoloft and Trazodone dosages. (Tr. 676.)

The following day, A.D. was discharged from Beech Brook, after having shown "much improvement" in reaching her goals. (Tr. 687-691.) Her diagnoses on discharge were generalized anxiety disorder and ADHD. (Tr. 689.)

On August 9, 2016, A.D. presented to Kristie Ross, M.D., for follow up regarding her sleep disturbance. (Tr. 694-696.) Dr. Ross ordered a sleep study due to reports that A.D. "continues to have episodes of screaming and breathing issues at night." (Tr. 695.)

The following day, A.D. returned to Dr. Bass for follow up regarding Tourette's Syndrome, anxiety and obsessive compulsive disorder. (Tr. 700-706.) Dillard reported the following symptoms:

> Mom reports [A.D.] continues to have disordered sleep patterns, with frequent waking and screaming events. She was seen yesterday by Dr Ross in sleep medicine, who has a low suspicion for parasomnias, but is planning to repeat a sleep study.

> [A.D.] currently has a complex motor tic where she shrugs and rolls her neck, which is seen many times throughout the day and is frustrating and irritating for her. She continues to have a vocal tic with a deep inhale. Mom feels overall these are contributing to her poor mood and daytime fatigue. She takes many naps. She restarts school on Monday, and is nervous about returning to school.

> Mom reports [A.D.'s] anxiety has been very bad lately. She is frequently overwhelmed and having vomiting intermittently, always in the context of high anxiety and changes in routines. She threw up at her 6th grade graduation and wasn't able to go on vacation due to vomiting. The last episode of vomiting was 3 weeks ago and lasted for approximately 3 days. She has vomited during sleep, the last time approximately 2 months ago.

> Mom reports [A.D.] has had increased daytime visual hallucinations. She sees people watching her and sees things in the TV when the TV is off. She says she sees scary faces, scary people and dogs. The images/ hallucinations move and are not fixed images. She denies these images 'talk' to her and she denies hearing voices that aren't there. She is seeing a psychiatrist who is aware of th[ese] symptoms and will be starting a new psychiatrist . . . scheduled for

> Monday. She isn't having compulsions or repetitive behaviors. She denies
> suicidal or homicidal ideation. She is often tearful.

(Tr. 700-701.) Mental status examination findings were normal, including full orientation,

normal attention and concentration, and fluent spontaneous speech with no paraphrasic errors.

(Tr. 704.)

Dr. Bass noted diagnoses of anxiety, depression, mood disorder, and provisional tic

disorder. (Tr. 704.) She did not recommend medication for A.D.'s tics, finding "her prominent

symptoms of anxiety, sleep disturbance, outbursts and tearfulness seem to be more distressing to

her and needing more urgent attention and are impacting her quality of life more than the motor

tics." (Tr. 705.)

On June 14, 2017, A.D. presented for treatment of her mental health issues at Signature

Health.[6] (Tr. 707-712.) Therapist Stacey Johnson noted that several conditions had been

diagnosed by psychiatrist Elise Bonder, M.D., including unspecified schizophrenia, major

depressive disorder, generalized anxiety disorder, and Tourette's disorder. (Tr. 707-708.) With

regard to A.D.'s schizophrenia, Ms. Johnson indicated A.D.'s treatment goal was to "stabilize,

through the use of psychotropic medications, psychotic and other severe and persistent mental

illness symptoms." (Tr. 711.) Ms. Johnson further noted A.D. had established services "within

the last month," and "mom reports no progress." (Tr. 712.)

**C.     State Agency Reports**

_____

[6] It appears A.D. established treatment at Signature Health on April 17, 2017, and had
follow up visits in May and early June 2017. (Tr. 707.) As discussed *infra*, however,
records of these visits were not before the ALJ at the time of her decision.

On March 2, 2015, A.D. underwent a psychological consultative examination with Deborah Koricke, Ph.D. (Tr. 565-578.) At the time of the evaluation, A.D. was 11 years and 3 months old. (Tr. 565.) Dillard reported A.D. was "struggling with learning problems that she believes prevent her daughter from acting in an age-appropriate manner." (Tr. 567.) Dillard further indicated A.D. was emotional, cried easily, suffered from "bad anxiety," woke up at least four to five times a week screaming, and had a limited interest in being around other children. (Tr. 568.) Dr. Koricke noted A.D. was receiving special education instruction for the learning disabled, and had had an Individual Education Plan ("IEP") since kindergarten. (Tr. 566.) She further noted A.D. was currently taking Zoloft, Risperdal, Prilosec, and "Hyclomin." (*Id*.)

On examination, Dr. Koricke noted A.D. "initially was quiet, but then warmed up, appearing happy and good-humored." (Tr. 569.) A.D. put forth "good effort" throughout the session and "was able to remain focused and on task without difficulty." (*Id*.) Dr. Koricke further found A.D. was polite with 100% intelligible speech. (*Id.*) She "did not experience difficulty understanding simple directives, but required lengthy questions to be repeated and broken down into small segments of information for her to understand." (*Id*.) In addition, while A.D. was able to adequately express her thoughts and feelings in simple terms," she had "very limited vocabulary, consistent with low intellectual capacity." (*Id*.) Dr. Koricke found "[i]n other words, there's no sign of expressive or receptive language disorders, but her speech and thinking processes are simplistic, associated with lower IQ." (*Id*.)

With regard to A.D.'s affect and mood, Dr. Koricke indicated A.D. was not anxious and was cooperative throughout the session. (*Id*.) She maintained eye contact, responded to questions, was "calm and relaxed," and appeared happy throughout. (Tr. 569-570.) A.D.

exhibited good attention with no difficulty being distracted.  (Tr. 570.)  Dr. Koricke further noted A.D. "showed no behavior indicative of psychotic proportions such as delusions or hallucinations, and her mother denies any indications of their presence."  (*Id*.)

Intelligence testing was conducted that date, which revealed a full scale IQ of 68.  (Tr. 570.)  Dr. Koricke indicated "this was viewed as somewhat lower than previous measures [showing a full scale IQ of 74]," and determined that A.D. "is estimated to be functioning higher within the borderline range of ability."  (Tr. 570, 572.)  Dr. Koricke further found A.D.'s insight and judgment was limited for her age due to low IQ and associated concrete or simplistic thinking.  (Tr. 570.)

Dr. Koricke assessed borderline intellectual functioning, and indicated "her presentation is consistent with a diagnosis of an anxiety disorder otherwise specified, but additional contact with the child is necessary to rule out additional difficulty with a depressive disorder."  (Tr. 573.) With regard to the four mental functional areas, Dr. Koricke found as follows:

> **1. Describe the claimant's abilities and limitations in acquiring and using information relative to the functioning of typically-developing children of the same age.**
>
> [A.D.] did not show specific problems with attention in this one-on-one situation in that she was neither impulsive nor inattentive.  She understood simple or one-step instructions, but had difficulty understanding complex or multi-step instructions, which had to be broken down into small segments of information for her to understand. She shows simplistic speech patterns and concrete thinking, associated with limited intellectual functioning. She has difficulty learning and retaining new information due to limited intellectual abilities, consistent with borderline intellectual functioning. She will require adults to give her small segments of information to be able to cognitively process and learn didactic information and will require one-on-one attention from adults to follow along in a group setting due to limited understanding. She also has a history of performance anxiety and will get so anxious and frustrated in the classroom that she becomes physically ill and requests to go home. This would make learning even more arduous for the child.

15

**2. Describe the claimant's abilities and limitations in attending to and completing tasks relative to the functioning of typically-developing children of the same age**

In this one-on-one situation, [A.D.] showed no difficulty with overt distractibility or inattention. Overall, she did not show deficits in sustained attention to oral or visual stimuli during the testing. I saw no signs of a diagnosable attention deficit disorder. She is seen as able to sustain attention for prolonged periods of time, but may require re-instruction from adults in a group setting to fully understand assigned tasks that are more challenging for her. She is likely to work well with peers in a group situation and is not seen to be impulsive or disruptive. She is not taking medication to control her attention.

**3. Describe the claimant's abilities and limitations in interacting and relating with others relative to the functioning of typically-developing children of the same age**

[A.D.]'s mother reports that she gets along with peers and has no difficulty getting along with others although she is more withdrawn and really does not have any close friends. She gets along with family members and has no difficulty with oppositional or defiant behaviors. During the examination, [A.D.] put forth consistently good effort and she was cooperative. She is polite and cooperative throughout the session. She showed an adequate frustration tolerance. She made good eye contact. She is respectful of teachers and of authority, in general, and her mother reported that she has not been suspended during the current school year.

**4. Describe the claimant's abilities and limitations in self-care relative to the functioning of typically-developing children of the same age**

[A.D.] can complete self-care activities with structure and reminders from mother. She is independent in caring for her hygiene. She is also independent in toileting and is able to sleep alone. Her mother did report difficulty with sleep when she is not taking her medication. She has difficulty with learning and is functioning within the borderline range of intellectual ability. She also has a history of significant anxiety, particularly in the school setting, and can become so anxious that she becomes physically ill and goes home.

Overall, the child's mother indicates that she is generally fairly well-behaved and responsive to discipline, although immature. She does not have explosive outbursts, but does struggle with significant anxiety despite her current medication (i.e. Zoloft and Risperdal ). In sum, she would experience difficulty functioning in

an age-appropriate manner related to her borderline  intellectual functioning and
other specified anxiety disorder.

(Tr. 573-575.)

On April 3, 2015, state agency psychologist Carl Tischler, Ph.D., reviewed A.D.'s

records and completed a Childhood Disability Evaluation Form.  (Tr. 579-584.)  Dr. Tischler

found "significant medical improvement" and concluded A.D.'s mental health impairments were

severe but did not meet, medically equal, or functionally equal the listings.  (Tr. 579.)

Specifically, Dr. Tischer concluded A.D. had "less than marked" limitations in the domains of

acquiring and using information, attending and completing tasks, and interacting and relating

with others.[7]  (Tr. 581.)

On April 9, 2015, state agency physician Milford Schwartz, M.D., reviewed A.D's

medical records and completed a Case Analysis.  (Tr. 584.)  Dr. Schwartz's review was limited

to "the physical aspects of the claim."  (*Id.*)  He found that "currently [A.D.] has normal

neuromotor findings with normal motor functioning per parent and file evidence . . .[Medical

Improvement] in this regard is documented by file evidence."  (*Id.*)  Dr. Schwartz concluded that

"at this time a severe physical impairment is not established."  (*Id.*)

On September 1, 2015, state agency physicians Todd Finnerty, Psy.D., and Uma Gupta,

M.D., reviewed A.D's records and completed a Childhood Disability Evaluation Form.  (Tr. 643-

649.)  Like Dr. Tischler, Drs. Finnerty and Gupta found "significant medical improvement" and

concluded A.D.'s mental health impairments were severe but did not meet, medically equal, or

---

[7] The fourth page of Dr. Tischler's opinion is missing from the administrative record and,
therefore, the Court cannot determine how he assessed A.D's functioning in the
remaining three domains.  (Tr. 581-582.)

functionally equal the listings.  (Tr. 643.)  Specifically, Drs. Finnerty and Gupta concluded A.D. had "less than marked" limitations in the domains of acquiring and using information, attending and completing tasks, interacting and relating with others, and health and physical well-being; and no limitation in the domains of moving about and manipulating objects and caring for yourself.  (Tr. 645-646.)

**D.      Hearing Testimony**

During the July 11, 2017 hearing, the ALJ first noted that Dillard and A.D. did not have a lawyer or other representative.  (Tr. 51.)  The ALJ advised Dillard of her right to representation, and offered to reschedule the hearing to allow her the opportunity to find a representative.  (Tr. 51-52.)  Dillard decided to go forward without a representative, stating she did not think anyone would help them.  (Tr. 53.)

The ALJ then asked A.D. a series of questions.  A.D. testified as follows:

- She will be entering the 8th grade in the fall.  (Tr. 60.)  When asked how she thought the new school year would be, she replied: "Probably a hot mess."  (Tr. 61.)  She does not learn anything at school.  (*Id.*)  She does not understand anything her teachers are saying.  (*Id.*)  Her teachers do not teach in a way that she can understand and, when she tries to ask a question, they ignore her or are disrespectful to her.  (Tr. 62-63.)  As result, she "stopped really caring anymore."  (*Id.*)

- She can read a little, but has difficulty writing and completing essays.  (Tr. 65.)  She does some assignments on a computer, and has a tablet at home.  (Tr. 62, 69.)  She does not have any books, and finds books boring.  (Tr. 68.)  She likes math and is in the regular math class at school.  (Tr. 61.)  However, she is not learning anything.  (*Id.*)  She gets pulled out for some special education classes.  (*Id.*)

- She has some friends at school but not a lot of them.  (Tr. 66.)  Sometimes she plays with her friends at recess.  (*Id.*)  In the summer, she goes to the gym, where she plays basketball and goes on the treadmill.  (Tr. 67.)  She refuses to join the school basketball team because "they don't take it serious and I'm not

going to put my effort into working and they're over there fooling around."
(*Id.*)

The ALJ also asked Dillard questions at the hearing.  She testified as follows:

- She believes A.D. is still disabled because she is having "more and more anxiety." (Tr. 58.)  A.D. sees things that aren't there, is often frustrated, and is always twitching her neck and rolling her hands. (*Id.*)  She does not think A.D. has improved at school. (*Id.*)  A.D.'s special education teachers correct her work and then her teachers give her full credit, which is not helping A.D. learn. (Tr. 59-60.)  It takes four to five hours to do just one page of A.D.'s homework. (Tr. 60.)  A.D.'s teachers have said they will suspend A.D. for raising her hand and asking questions. (Tr. 59.)  She is pulling A.D. out of her current school and trying to find a better one.

- A.D. "blurts out a lot of stuff that she shouldn't." (Tr. 70.)  A.D. can become verbally aggressive and has "a lot of breakdowns in school," during which she needs to leave the classroom to calm down. (Tr. 70-71.)  A.D. becomes emotional often and has outbursts where she cries and screams. (Tr. 72.)

- A.D. "sees heads everywhere" and "feels like they're going to get her." (Tr. 74.) A.D. wakes up screaming and yelling four times per week. (Tr. 77.)  The doctors at Signature Health have diagnosed schizophrenia. (Tr. 73.)  A.D. is taking Abilify and Zoloft. (Tr. 74.)  The Abilify is to help with A.D.'s Tourette's. (*Id.*)  The medications are not helping yet, although she has noticed that A.D. smiles a little more often. (*Id.*)

- She feels that A.D.'s schizophrenia and Tourette's inhibit her ability to learn, and cause her to feel overly anxious. (Tr. 75.)

## III.    STANDARD FOR DISABILITY

**A.    Initial Disability Determination**

To qualify for SSI benefits, an individual must demonstrate a disability as defined under

the Act.  "An individual under the age of 18 shall be considered disabled ... if that individual has

a medically determinable physical or mental impairment, which results in marked and severe

functional limitations, and which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C).

To determine whether a child is disabled, the regulations prescribe a three-step sequential evaluation process. 20 C.F.R. § 416.924(a). At step one, a child must not be engaged in "substantial gainful activity." 20 C.F.R. § 416.924(b). At step two, a child must suffer from a "severe impairment." 20 C.F.R. § 416.924(c). At step three, disability will be found if a child has an impairment, or combination of impairments, that meets, medically equals or functionally equals an impairment listed in 20 C.F.R. § 404, Subpt. P, App'x 1. 20 C.F.R. § 416.924(d).

To determine whether a child's impairment functionally equals the listings, the Commissioner will assess the functional limitations caused by the impairment. 20 C.F.R. § 416.926a(a). The Commissioner will consider how a child functions in six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for [ ]self; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi). If a child's impairment results in "marked" limitations in two domains, or an "extreme" limitation in one domain, the impairments functionally equal the listings and the child will be found disabled. 20 C.F.R. § 416.926a(d). To receive SSI benefits, a child recipient must also meet certain income and resource limitations. 20 C.F.R. §§ 416.1100, 416.1201.

A "marked" limitation is one which seriously interferes with functioning. 20 C.F.R. § 416.926a(e)(2)(i). "Marked" limitation means "more than moderate" but "less than extreme." 20 C.F.R. § 416.926a(e)(2)(i). "It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean." *Id.* An "extreme" limitation is one that "interferes very seriously with [a

child's] ability to independently initiate, sustain, or complete activities."  20 C.F.R. §

416.926a(e)(3)(i).  An "extreme" limitation means "more than marked."  20 C.F.R. §

416.926a(e)(3)(I).  "It is the equivalent of the functioning we would expect to find on

standardized testing with scores that are at least three standard deviations below the mean."  *Id.*

If an impairment is found to meet, or qualify as the medical or functional equivalent of a

listed disability and the twelve-month durational requirement is satisfied, the claimant will be

deemed disabled.  20 C.F.R. § 416.924(d)(1).

**B.**      **Review of a Child's Continued Eligibility for Benefits**

The Social Security Act generally requires proof of continued eligibility for benefits, and

requires the termination of benefits if an individual is no longer eligible.  *See* 42 U.S.C. § 423(f).

A review of an individual's continued eligibility for benefits is called a "continuing disability

review" or "CDR."  For individuals under the age of 18, social security regulations provide that a

CDR should be conducted "not less frequently than once every 3 years."  42 U.S.C. §

1382c(a)(3)(H)(ii)(I).

The regulations provide a three-step process for reviewing a disabled child's continued

eligibility for benefits.  At step one of this process, the Commissioner determines whether there

has been any "medical improvement" in the impairments that the child had at the most recent

favorable determination that she was disabled (i.e., the "comparison point decision" or "CPD").

20 C.F.R. § 416.994a(a)(1).  The regulations define "medical improvement" as follows:

> Medical improvement is any decrease in the medical severity of your impairment(s)
> which was present at the time of the most recent favorable decision that you were
> disabled or continued to be disabled. Although the decrease in severity may be of any
> quantity or degree, we will disregard minor changes in your signs, symptoms, and
> laboratory findings that obviously do not represent medical improvement and could
> not result in a finding that your disability has ended. A determination that there has

been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs, or laboratory findings associated with your impairment(s).

20 C.F.R. § 416.994a(c).

"If there has been no medical improvement [the Commissioner] will find that [the child's] disability continues" unless certain limited exceptions to medical improvement apply. 20 C.F.R. §§ 416.994a(b)(1)(i) and (ii); 416.994a(e) and (f); Social Security Ruling ("SSR") 05–03p, 2005 WL 1041037 at 1*–3 ("At each step of the process, certain 'exceptions to medical improvement' may apply, under which disability can be found to have ended even though medical improvement has not occurred. (20 CFR 416.994a(e)-(f).").

If medical improvement has occurred, the Commissioner proceeds to step two. 20 C.F.R. § 416.994a(b)(2); SSR 05–03p, 2005 WL 1041037 at *1. If the CPD was made on or after January 2, 2001 and was based upon functional equivalence to a listed impairment (as is the case herein), then the Commissioner must determine whether the impairment now functionally equals the severity of the listed impairment that it met or equaled before. 20 C.F.R. § 416.994a(b)(2); SSR 05–03p, 2005 WL 1041037 at *1–*3. If the impairment still functionally equals a listed impairment, then disability benefits will continue. *Id*. If the impairment does not, the Commissioner will proceed to step three. *Id*.

At step three, the Commissioner must determine whether the child is currently disabled in accordance with the rules for determining disability for children. 20 C.F.R. § 416.994a(b)(3). In determining whether a child is currently disabled, the Commissioner will consider all of the impairments that the child now has, including those not had at the time of the CPD, or those that the Commissioner did not consider at that time. *Id*. The steps in determining a current disability are summarized at 20 C.F.R. § 416.994a(b)(3):

22

(i)     Do you have a severe impairment or combination of impairment [sic]? If there has been medical improvement in your impairment(s) ... we will determine whether your current impairment(s) is severe, as defined in § 416.924(c). If your impairment(s) is not severe, we will find that your disability has ended. If your impairment(s) is severe, we will then consider whether it meets or medically equals the severity of a listed impairment.

(ii)    Does your impairment(s) meet or medically equal the severity of any impairment listed in appendix 1 of subpart P of part 404 of this chapter? If your current impairment(s) meets or medically equals the severity of any listed impairment, as described in §§ 416.925 and 416.926, we will find that your disability continues. If not, we will consider whether it functionally equals the listings.

(iii)   Does your impairment(s) functionally equal the listings? If your current impairment(s) functionally equals the listings, as described in § 416.926a, we will find that your disability continues. If not, we will find that your disability has ended.

20 C.F.R. § 416.994a(b)(3)(i), (ii) and (iii).

When the Commissioner evaluates whether a claimant continues to qualify for benefits, the claimant is not entitled to a presumption of continuing disability. *See Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994); *Bradley v. Comm'r of Soc. Sec.*, 2016 WL 7383403 at * 2 (W.D. Mich. Dec. 21, 2016). Rather, the decision whether to terminate benefits must "be made on the basis of the weight of the evidence and on a neutral basis with regard to the individual's condition." *Id.* Nevertheless, the burden of proof to establish that a claimant has experienced a medical improvement which supports a termination of benefits lies with the Commissioner. *See, e.g., Kennedy v. Astrue*, 247 Fed. Appx. 761, 764–65 (6th Cir. Sept. 7, 2007); *Bradley*, 2016 WL 7383403 at *2; *Couch v. Comm'r of Soc. Sec.*, 2012 WL 394878 at *10 (S.D. Ohio, Feb. 7, 2012).

## IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.	The most recent favorable medical decision finding that the claimant was disabled is the determination dated August 9, 2005.  This is known as the "comparison point decision" or CPD.

2.	At the time of the CPD, the claimant had the following medically determinable impairments:  borderline intellectual functioning and developmental coordination disorder.  These impairments were found to functionally equal the listings (20 CFR 406.924(d) and 416.926a).

3.	Medical improvement occurred as of April 1, 2015 (20 CFR 416.994a(c)).

4.	The claimant was born on November ** 2003.  Therefore, she was a school age child, as of April 1, 2015.  The claimant is currently an adolescent.  (20 CFR 416.926a(g)(2)).

5.	Since April 1, 2015, the impairments that the claimant had at the time of the CPD have not functionally equaled the Listings of Impairments (20 CFR 416.994a(b)(2) and 419.926a and SSR 05-03p).

6.	Since April 1, 2015, the claimant has had the following severe impairments:  anxiety disorder, borderline intellectual functioning, gastritis, specific learning disabilities, and ADHD (20 CFR 416.924(c)).

7.	Since April 1, 2015, the claimant has not had an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.925 and 416.926).

8.	Since April 1, 2015, the claimant has not had an impairment or combination of impairments that functionally equals the listings (20 CFR 416.924(d) and 416.926a).

9.	The claimant's disability ended as of April 1, 2015, and the claimant has not become disabled again since that date (20 CFR 416.994a).

(Tr. 19-40.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether

the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.

Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### *Failure to Consider A.D.'s Psychotic Disorder and Tourette's Syndrome*

In her first assignment of error, Dillard argues "[t]he ALJ's failure to recognize A.D.'s psychotic disorder and Tourette's syndrome as severe impairments, or consider their combined impact, resulted in a legally insufficient analysis of Plaintiff's disability under the listings." (Doc. No. 13 at 13-15.)  Although somewhat unclear, Dillard appears to assert remand is required because the ALJ failed to consider these impairments in determining, at step three, that

A.D. did not meet or equal a listed impairment. (*Id*. at 14.) She maintains "the ALJ did not compare the medical evidence of Plaintiff's Tourette's syndrome, manifested by a complex motor tic where she shrugs and rolls her neck many times throughout the day and by a vocal tic with a deep inhale, and her schizophrenia/psychotic disorder and auditory hallucinations, with the requirements of the listings." (*Id*. at 14-15.)

The Commissioner argues the ALJ properly considered the combined impact of A.D.'s mental health impairments. (Doc. No. 15 at 12-13.) She notes the ALJ engaged in a lengthy discussion of the medical evidence relating to A.D.'s impairments, including evidence relating to A.D.'s psychotic symptoms and vocal tics. (*Id*.) However, the Commissioner asserts the ALJ discounted this evidence due to the lack of a "definitive diagnosis from an acceptable medical source." (*Id*.) The Commissioner also notes the ALJ's citation to medical evidence that contradicted Dillard's reports of hallucinations and motor tics, including Dr. Koricke's consultative examination report. (*Id*.)

At the outset, the Court notes Dillard's argument is somewhat unclear. She appears to argue the ALJ failed to properly consider whether A.D.'s psychotic disorder and Tourette's met or equaled the requirements of a Listing, but then fails to direct this Court's attention to any specific Listing that she believes the ALJ should have considered. Nor does she explain how the evidence in this case supports a finding that A.D. met or equaled the requirements of any particular Listing relating to either A.D.'s psychotic disorder or Tourette's. Thus, the Court finds any argument relating to the ALJ's failure to consider whether A.D. met or equaled the requirements of a specific Listing, to be waived.

This assignment of error could also be construed as asserting that remand is required because the ALJ failed to consider the combined impact of all of A.D.'s mental health impairments (including her psychotic disorder and Tourette's) in determining whether she functionally equaled the listings. To functionally equal the listings, an impairment(s) must be of listing-level severity; i.e. it must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. *See* 20 C.F.R. § 416.926a(a); Social Security Ruling ("SSR") 09–1p, 2009 WL 296031 (February 17, 2009). In determining whether a child has a "marked" or "extreme" limitation, the Agency will:

> ... consider your functional limitations resulting from all of your impairments, including their interactive and cumulative effects. We will consider all the relevant information in your case record that helps us determine your functioning, including your signs, symptoms, and laboratory findings, the descriptions we have about your functioning from your parents, teachers, and other people who know you, and the relevant factors explained in §§ 416.924a, 416.924b, and 416.929.

20 C.F.R. § 416.926a(e). The factors set forth in §§ 416.924a, 416.924b, and 416.929 include, but are not limited to the following: how well a child can initiate and sustain activities; how much extra help a child needs; the effects of structured or support settings; how a child functions in school; and the effects of medications or other treatment. *See* 20 C.F.R. § 416.926a(a). In determining whether a child functionally equals a listing, ALJs need not discuss all of the considerations set forth in 20 C.F.R. § 926a and SSR 09–1p; however, they must "provide sufficient detail so that any subsequent reviewers can understand how they made their findings." SSR 09–1p.[8]

---

[8] In assessing functional equivalence, the Agency employs a "whole child" approach. Under this approach, "[w]e focus first on the child's activities, and evaluate how appropriately, effectively, and independently the child functions compared to children of the same age who do not have impairments. 20 CFR § 416.926a(b) and (c). We consider

Here, the ALJ found that, since April 1, 2015, A.D. suffered from the severe impairments of anxiety disorder, borderline intellectual functioning, gastritis, specific learning disabilities, and ADHD. (Tr. 32.) She concluded A.D.'s schizophrenia and Tourette's did not constitute medically determinable impairments, finding "the record contains no definitive diagnosis of these conditions from an acceptable medical source." (*Id.*) After finding A.D.'s severe impairments did not meet or equal the requirements of Listings 112.05 (intellectual disorder), 112.06 (anxiety and obsessive-compulsive disorders), 112.11 (ADHD and neurodevelopmental disorders) and 105.06 (gastritis), the ALJ went on to consider whether A.D.'s impairments functionally equaled the listings. (Tr. 32-34.)

At this step, the ALJ noted she had "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529." (Tr. 34.) The ALJ then discussed the evidence regarding A.D.'s mental health impairments at some length. (Tr. 34-37.) As part of this discussion, the ALJ repeatedly acknowledged Dillard's reports that A.D. experienced hallucinations and vocal and motor tics. (Tr. 34, 36.) However, the ALJ noted that, during the March 2015 consultative examination, Dr. Koricke found A.D. "showed no behavior indicative of psychotic proportions such as delusions or hallucinations, and her mother denied any indications of their presence." (Tr. 36.) Moreover, the ALJ observed that Dr. Koricke "did

what activities the child cannot do, has difficulty doing, needs help doing, or is restricted from doing because of the impairments. 20 CFR 416.926a(a). Activities are everything a child does at home, at school, and in the community, 24 hours a day, 7 days a week." SSR 09–2p, 2009 WL 396032 (February 18, 2009). The Agency next evaluates the effects of a child's impairments by rating the degree to which the impairment(s) limits functioning in the six domains. SSR 09–2p.

not indicate the claimant had exhibited any vocal or physical tics." (*Id.*) Later in the decision, the ALJ also noted that, during a June 2015 appointment, A.D.'s father "denied that the claimant was experiencing hallucinations and other symptoms reported by the claimant's mother." (*Id.*) In addition, the ALJ noted Dr. Bass did not observe any motor tics during her examinations of A.D. and, further, assessed only a "provisional tic disorder" for which she declined to prescribe medication. (Tr. 36-37.) Lastly, the ALJ found there was "no definitive diagnosis" of Tourette's in the record and stated "the claimant spoke quite well and was articulate" during the hearing. (Tr. 37.)

For the following reasons, the Court finds Dillard's first assignment of error is without merit. Although the ALJ concluded A.D.'s psychotic disorder and Tourette's did not constitute medically determinable impairments, it is clear from a review of the decision that she fully considered A.D.'s symptoms from these impairments during her functional equivalence analysis. As noted above, the ALJ explicitly acknowledged and discussed Dillard's repeated reports that A.D. "sees things that aren't there" and experiences motor tics involving her neck and hands. (Tr. 34, 36.) However, the ALJ correctly noted these reported symptoms were often inconsistent with other evidence in the record. For example, with regard to symptoms of A.D.'s psychotic disorder, the record reflects Dillard reported A.D. was suffering from visual hallucinations in January 2014, and A.D. was thereafter prescribed Risperdal. (Tr. 543-544.) Subsequent treatment notes from Beech Brook, however, indicate A.D. improved with medication and thereafter consistently denied delusions, hallucinations, or paranoia between October 2014 and May 2016. (Tr. 677, 545, 599, 675.) Moreover, as the ALJ correctly noted, Dr. Koricke found no behavior indicative of delusions or hallucinations during the consultative examination and

stated that, in fact, Dillard "denied any indications of their presence." (Tr. 570.) Several months later, A.D.'s father similarly denied that A.D. suffered from hallucinations. (Tr. 621.)

With regard to A.D.'s Tourette's symptoms, the ALJ expressly acknowledged reports that A.D. "twitches her neck and rolls her hands" and experiences "vocal tics." (Tr. 34, 36.) However, as the ALJ correctly noted, A.D.'s neurologist, Dr. Bass, did not observe evidence of A.D.'s tics and documented normal, fluent speech during each of her examinations. (Tr. 625-626, 704.) Moreover, Dr. Bass limited her diagnosis to "provisional tic disorder" and repeatedly declined to prescribe medication for the condition. (Tr. 626, 704-705.)

In sum, a careful review of the decision reveals the ALJ fully considered the combined impact of A.D.'s impairments, including symptoms of her psychotic disorder and Tourette's Syndrome. While the Court acknowledges the ALJ improperly found no diagnosis of these conditions in the medical record from an acceptable medical source,[9] the ALJ nonetheless thoroughly discussed the medical evidence regarding these conditions during her functional equivalence analysis. Moreover, for the reasons discussed above, the ALJ correctly found that the reported severity of A.D.'s symptoms from these conditions was not consistent with other medical evidence in the record.

Accordingly, Dillard's first assignment of error is without merit.

***Functional Equivalence***

---

[9] As noted in this Court's discussion of the medical evidence, Dr. Golden diagnosed a psychotic disorder in January 2014. (Tr. 544.) Further, A.D.'s June 2017 treatment note from Signature Health indicates that, in May 2017, Dr. Bonder diagnosed both schizophrenia and Tourette's. (Tr. 707-708.)

In her second assignment of error, Dillard argues the ALJ erred in finding A.D. had less than marked limitations in the domains of Acquiring and Using Information, and Caring for Yourself. (Doc. No. 13 at 15-18.) Specifically, she maintains remand is required because "the ALJ considered only limited portions of the record, did not properly account for symptoms and limitations in the medical evidence, and [] credited Social Security consultants who had not evaluated the entire record." (*Id*. at 15.) The Commissioner argues substantial evidence supports the ALJ's determination that A.D.'s mental impairments did not functionally equal the Listings. (Doc. No. 15.)

The Court will discuss each of the two domains at issue separately, below.

### *Acquiring and Using Information*

The domain of acquiring and using information considers "how well [the child] acquire[s] or learn[s] information, and how well [the child] use[s] the information [he/she] has learned." 20 C.F.R § 416.926a(g). A.D. was a school-age child as of April 1, 2015, and subsequently changed age categories to an adolescent as of the date of the hearing. *See* 20 C.F.R. § 416.926a(g)(2)(iv) and (v). With regard to school age children, the Agency considers a child's functioning in this domain in the following context:

> When you are old enough to go to elementary and middle school, you should be able to learn to read, write, and do math, and discuss history and science. You will need to use these skills in academic situations to demonstrate what you have learned; e.g., by reading about various subjects and producing oral and written projects, solving mathematical problems, taking achievement tests, doing group work, and entering into class discussions. You will also need to use these skills in daily living situations at home and in the community (e.g., reading street signs, telling time, and making change). You should be able to use increasingly complex language (vocabulary and grammar) to share information and ideas with individuals or groups, by asking questions and expressing your own ideas, and by understanding and responding to the opinions of others.

20 C.F.R § 416.926a(g)(iv). Examples of limitations in this domain include, but are not limited to: inability to demonstrate understanding of words about space, size or time; inability to rhyme words or the sounds in words; difficulty recalling important things learned in school yesterday; difficulty solving mathematics questions or computing arithmetic answer; talking only in short, simple sentences and difficulty explaining what you mean. *See* 20 C.F.R § 416.926a(g)(i)-(v).

The regulations consider an adolescent child's functioning in this domain, as follows: "In middle and high school, you should continue to demonstrate what you have learned in academic assignments (e.g., composition, classroom discussion, and laboratory experiments). You should also be able to use what you have learned in daily living situations without assistance (e.g., going to the store, using the library, and using public transportation). You should be able to comprehend and express both simple and complex ideas, using increasingly complex language (vocabulary and grammar) in learning and daily living situations (e.g., to obtain and convey information and ideas). You should also learn to apply these skills in practical ways that will help you enter the workplace after you finish school (e.g., carrying out instructions, preparing a job application, or being interviewed by a potential employer)." 20 C.F.R. § 416.926a(g)(v).

As relevant to this domain, the ALJ concluded, at step two, that A.D. suffered from the severe impairments of borderline intellectual functioning, specific learning disabilities, and ADHD. (Tr. 32.) In her functional equivalence analysis, the ALJ discussed medical and educational records regarding A.D.'s cognition, as follows:

As for her psychological impairments, a December 2014 questionnaire from school intervention specialist BethAnn Clark indicated that the claimant's full scale IQ was 74 (Exhibit 5F, 7), and that the claimant qualified for services as a student with a specific learning disability. However, Ms. Clark also indicated that the claimant was

at mid fourth grade level in reading and math, and fourth grade level in written language (Exhibit 5E, 3).

In March 2015, Deborah Koricke, PhD, completed a psychological consultative examination and intellectual testing at which time she diagnosed the claimant with borderline intellectual functioning and other specified anxiety disorder (Exhibit 13F, 8). Dr. Koricke administered the WISC-IV at which time the claimant attained a full-scale IQ score of 68. However, Dr. Koricke noted that this score was lower than expected given the claimant's presentation and past test results, and the claimant's April 2015 school Individualized Education Program (IEP) (Exhibit 13F, 8). Indeed, the April 2015 IEP indicated that the claimant was able to attend regular education classes, except when receiving resource room assistance in math, language arts, and speech therapy (Exhibit 11E). The IEP indicated the claimant struggles with some health issues (stomach problems) and anxiety. However, the IEP also noted that the claimant is polite, well liked by peers and staff, and she has opened up more and made more friends (Exhibit 1 lE, 3).

* * *

. . . 2015-2016 education records indicate the child was well behaved, respectful, and she gets along well with her peers in the school setting. Additionally, these records note the claimant has grown in confidence, and learned to be an advocate for herself both academically and in regards to friends (Exhibit 17E).

(Tr. 35-36.) The ALJ then evaluated the specific domain of acquiring and using information, as

follows:

Since April 1, 2015, the claimant has had less than marked limitation in acquiring and using information.

. . . .[D]uring the mental status examination with Dr. Koricke, the claimant did not experience difficulty understanding simple directives, but required lengthy questions to be repeated and broken down into small segments of information for her to understand. The[] claimant had no signs of expressive or receptive language disorders, but her speech and thinking processes are simplistic, associated with lower IQ (Exhibit 13F, 5). The claimant's April 2015 IEP indicated that the claimant was able to attend regular education classes, except when receiving resource room assistance in math, language arts, and speech therapy (Exhibit 11E).

The claimant testified she is going into eighth grade. The claimant testified she likes math and is in regular classes for that subject. She uses the computer to play games and complete assignments in math and English. She is learning to read, but struggles with essays. She does ok on the computer, but if it does not go right, she gets

34

frustrated.  On balance, the undersigned  finds less than marked limitation in this area, which is consistent with the assessments of the State agency medical and psychological consultants (Exhibit 14F; 20F)

(Tr. 38.)

Substantial evidence supports the ALJ's conclusion that A.D. had a less than marked limitation in acquiring and using information.  As the ALJ noted, A.D.'s educational records showed that she received instruction in the regular classroom except when receiving special education services.  (Tr. 243.)  When she was in the fourth grade, her "current instructional levels" for reading and math were at mid-grade or grade level.  (Tr. 204.)  In the fifth grade, A.D.'s grades consisted of mostly B's and C's in reading, language, arts and math; and she achieved A's and B's in social studies, science, art, and music.  (Tr. 244.)  An IEP Progress Report from May 2016 (when A.D. was in the sixth grade), indicated she was showing improvement and making consistent progress towards her goals.  (Tr. 265, 267, 268.)  A.D.'s sixth grade report card generally found she was either meeting grade level expectations or progressing towards grade level expectations with assistance.  (Tr. 271-272.)

Intelligence testing from 2012 (when A.D. was 8 years old) showed a full scale IQ of 74.  (Tr. 208.)  Although intelligence testing in March 2015 was somewhat lower (full scale IQ of 68), Dr. Koricke determined A.D. "is estimated to be functioning higher within the borderline range of ability."  (Tr. 570, 572.)  Courts have upheld ALJ determinations that a claimant does not functionally equal a listing under similar circumstances.  *See e.g.*, *Elam ex rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124, 126 (6th Cir. 2003) (upholding decision that claimant did not meet, medically equal or functionally equal a Listing where ALJ credited physician opinion that claimant was operating in the borderline range of intelligence despite the fact that her

intelligence test scores, standing alone, would indicate mental retardation); *Williams on behalf of D.W. v. Comm'r of Soc. Sec.*, 2017 WL 2304420 at * 13 (N.D. Ohio April 12, 2017) (same).

Furthermore, in evaluating A.D.'s functional limitations, the ALJ accorded great weight to the assessments of state agency psychologists Dr. Finnerty, Dr. Tischler, and Dr. Gupta. Each of these doctors concluded A.D. had a "less than marked limitation" in Acquiring and Using Information. (Tr. 581, 645-646.) These medical opinions provide substantial evidence in support of the ALJ's finding that A.D. has a "less than marked" limitation in this domain.

Dillard argues the remand is nonetheless required because the ALJ failed to adequately consider state proficiency testing indicating A.D. was not proficient in math, English language arts, or social studies. (Doc. No. 13 at 16.) She also maintains the ALJ failed to fully consider evidence that, although A.D. showed some improvement, she was provided with a wide range of special education services and accommodations. (*Id.*)

The Court finds Dillard's argument to be without merit. The ALJ made it clear that she considered A.D.'s educational records. (Tr. 35-36, 38.) She acknowledged A.D. had an IEP and received special education services and various accommodations at school, but found the record as a whole showed A.D. received average grades and her ability to learn improved with additional instruction and support. (Tr. 35-38.) Further, even if A.D.'s state proficiency test results supported the conclusion that A.D. was markedly limited in this area, remand would not be appropriate as the ALJ's conclusion is supported by substantial evidence. *See Ealy*, 594 F.3d at 512 ("If the Commissioner's decision is based upon substantial evidence, we must affirm, even if substantial evidence exists in the record supporting a different conclusion."). Indeed,

"the evaluation of whether substantial evidence exists does not involve deciding whether this Court would have reached a different decision based upon any singular piece of evidence." *Smith v. Comm'r of Soc. Sec.*, 2015 WL 9467684 at * 7 (S.D. Ohio Dec. 2, 2015) *report and recommendation adopted*, 2015 WL 9460280 (S.D. Ohio Dec. 28, 2015).  In view of all the other countervailing evidence, the Court finds there is substantial evidence in the record to support the ALJ's conclusion that A.D. was not markedly impaired in Acquiring and Using Information.

As another district court within this Circuit has explained, "many children with 'less than marked' limitations may perform poorly in school and/or require significant additional resources for a variety of reasons that do not equate to a 'disability.' " *Darks v. Comm'r of Soc. Sec.*, 2016 WL 703581 at * 5 (S.D. Ohio Jan. 25, 2016), *report and recommendation adopted*, 2016 WL 695992 (S.D. Feb. 22, 2016).  *See also Williams,* 2017 WL 2304420 at * *Smith*, 2015 WL 9467684 at * 9.   However, the ALJ's decision must be affirmed so long as "such relevant evidence [exists] as a reasonable mind might accept as adequate to support" it.  *Cutlip*, 25 F.3d at 286.

For all the reasons set forth above, the Court finds substantial evidence in the record supports the ALJ's determination that A.D. had a "less than marked" limitation in the domain of Acquiring and Using Information.  Dillard's argument to the contrary is without merit.

### *Caring for Yourself*

Dillard next argues substantial evidence does not support the ALJ's determination that A.D. has a less than marked limitation in the domain of Caring for Yourself.  (Doc. No. 13 at 16-17.)

The domain of Caring for Yourself considers "how well you maintain a healthy emotional and physical state, including how well you get your physical and emotional wants and needs met in appropriate ways; how you cope with stress and changes in your environment; and whether you take care of your own health, possessions, and living area." 20 CFR § 416.926a(k). As a general description of this domain, the regulations provide as follows:

1) General.

(i) Caring for yourself effectively, which includes regulating yourself, depends upon your ability to respond to changes in your emotions and the daily demands of your environment to help yourself and cooperate with others in taking care of your personal needs, health and safety. It is characterized by a sense of independence and competence. The effort to become independent and competent should be observable throughout your childhood.

(ii) Caring for yourself effectively means becoming increasingly independent in making and following your own decisions. This entails relying on your own abilities and skills, and displaying consistent judgment about the consequences of caring for yourself. As you mature, using and testing your own judgment helps you develop confidence in your independence and competence. Caring for yourself includes using your independence and competence to meet your physical needs, such as feeding, dressing, toileting, and bathing, appropriately for your age.

(iii) Caring for yourself effectively requires you to have a basic understanding of your body, including its normal functioning, and of your physical and emotional needs. To meet these needs successfully, you must employ effective coping strategies, appropriate to your age, to identify and regulate your feelings, thoughts, urges, and intentions. Such strategies are based on taking responsibility for getting your needs met in an appropriate and satisfactory manner.

(iv) Caring for yourself means recognizing when you are ill, following recommended treatment, taking medication as prescribed, following safety rules, responding to your circumstances in safe and appropriate ways, making decisions that do not endanger yourself, and knowing when to ask for help from others.

20 C.F.R. § 416.926a(k)(1). With regard to school age children, the Agency considers a child's functioning in this domain in the following context:

(iv) School-age children (age 6 to attainment of age 12). You should be independent in most day-to-day activities (e.g., dressing yourself, bathing yourself), although you may still need to be reminded sometimes to do these routinely. You should begin to recognize that you are competent in doing some activities and that you have difficulty with others. You should be able to identify those circumstances when you feel good about yourself and when you feel bad. You should begin to develop understanding of what is right and wrong, and what is acceptable and unacceptable behavior. You should begin to demonstrate consistent control over your behavior, and you should be able to avoid behaviors that are unsafe or otherwise not good for you. You should begin to imitate more of the behavior of adults you know.

20 C.F.R. § 416.926a(k)(2)(iv).[10]

The regulations consider an adolescent child's functioning in this domain, as follows: "You should feel more independent from others and should be increasingly independent in all of your day-to-day activities. You may sometimes experience confusion in the way you feel about yourself. You should begin to notice significant changes in your body's development, and this can result in anxiety or worrying about yourself and your body. Sometimes these worries can make you feel angry or frustrated. You should begin to discover appropriate ways to express your feelings, both good and bad (e.g., keeping a diary to sort out angry feelings or listening to music to calm yourself down). You should begin to think seriously about your future plans, and what you will do when you finish school." 20 CFR § 416.926a(k)(2)(v).

---

[10] Examples of limitations in this domain include, but are not limited to: continuing to place non-nutritive or inedible objects in his/her mouth; using self-soothing activities showing developmental regression (e.g., thumbsucking, re-chewing food), or having restrictive or stereotyped mannerisms (e.g., body-rocking, headbanging); failing to dress or bathe appropriately for his/her age because of an impairment that affects this domain; engaging in self-injurious behavior (e.g., suicidal thoughts or actions, self-inflicted injury, or refusal to take medication) or ignoring safety rules; failing to spontaneously pursue enjoyable activities or interests; and evidence of a disturbance in eating or sleeping patterns. 20 C.F.R. § 416.926a(k)(3). These examples do not describe a specific degree of limitation in this domain. *Id.*

Further guidance regarding the domain of Caring for Yourself is provided in Social Security Ruling ('SSR") 09-7p, 2009 WL 396029 (February 17, 2009).[11] Therein, the Agency explains that "in 'Caring for Yourself,' we focus on how well a child relates to _self_ by maintaining a healthy emotional and physical state in ways that are age-appropriate and in comparison to other same-age children who do not have impairments." SSR 09-07p, 2009 WL 396029 at *2 (emphasis in original). With regard to a child's ability to regulate his/her emotional wants and needs, the Agency explains as follows:

> Children must learn to recognize and respond appropriately to their feelings in ways that meet their emotional wants and needs; for example, seeking comfort when sad, expressing enthusiasm and joy when glad, and showing anger safely when upset. To be successful as they mature, children must also be able to cope with negative feelings and express positive feelings appropriately. In addition, after experiencing any emotion, children must be able to return to a state of emotional equilibrium. The ability to experience, use, and express emotion is often referred to as self-regulation. Children should demonstrate an increased capacity to self-regulate as they develop.

_Id._ at * 3 (emphasis in original.)

Here, the ALJ's discussion of A.D.'s functioning in the domain of Caring for Yourself is cursory:

> Since April 1, 2015, the claimant has had less than marked limitation in the ability to care for herself

---

[11] SSR's "are binding on all components of the Social Security Administration" and "represent precedent final opinions and orders and statements of policy and interpretations" adopted by the agency. 20 C.F.R. § 402.35(b)(1). While SSR's do not have the force of law, they are an agency's interpretation of its own regulations and "entitled to substantial deference and will be upheld unless plainly erroneous or inconsistent with the regulation." _Kornecky v. Comm'r of Social Security_, 167 Fed. Appx. 496, 498 (6th Cir. 2006).

The claimant helps with chores, such as cleaning her bedroom, and her mother denied that the claimant had any difficulty completing her chores (Exhibit 13F, 7; Hearing testimony).

In September 2016, the claimant's mother reported she helps the claimant get to school on time, administers her medication, cooks for her, and takes her to school. She also reminds the claimant to shower and brush her teeth (Exhibit 18E, 7). The undersigned finds less than marked limitation in this area.

(Tr. 40.)

The Court finds the ALJ did not provide a sufficient analysis of this domain. The sole reason provided by the ALJ for finding A.D. less than marked in this domain is that A.D. is able to complete her chores without difficulty. (Tr. 40.) The domain of Caring for Yourself, however, is not simply concerned with whether a child can complete household chores. Rather, as noted at length above, this domain assesses a variety of behaviors and skills, including a child's ability to maintain a healthy emotional state through self-regulation of his/her emotions. This includes an assessment of a child's ability to cope with stress and frustration, handle changes in his/her environment, express anger safely when upset, and return to a state of emotional equilibrium after experiencing strong emotions. *See* SSR 09-07p, 2009 WL 396029 at * 3. This domain also evaluates a child's ability to regulate his/her physical needs in a healthy way and considers whether a child follows safety rules, refuses to take medication, responds to circumstances in safe and appropriate ways, and exhibits sleep and/or eating disturbances. *Id*. at *3-4. Here, although the ALJ recites some of the record evidence regarding these issues at various points in the decision, the ALJ fails to meaningfully analyze this evidence or discuss how, in light of this evidence, he reached the conclusion that A.D. had a "less than marked" limitation in the context of the domain of Caring for Yourself.

This is problematic as the record is replete with evidence of A.D.'s difficulties in maintaining a healthy emotional state, including evidence regarding her problems handling frustration and stress, coping with change, and maintaining "emotional equilibrium." For example, in December 2014, A.D.'s intervention specialist, Ms. Clark, concluded she had "obvious problems" in handling frustration appropriately, identifying and appropriately asserting emotional needs, responding appropriately to changes in her own mood, and using appropriate coping skills. (Tr. 205-206.) Ms. Clark further noted A.D. becomes easily frustrated and emotional, and occasionally asked to go home because of anxiety and worry. (Tr. 207.) Later that month, A.D.'s providers at Beech Brook noted A.D. was struggling with implementing coping skills, and diagnosed her with anxiety disorder. (Tr. 558-559.) In May 2016, Dr. Eppright noted A.D. was "still struggling with depression/anxiety," and "some school refusal," and increased her Trazodone dosage. (Tr. 673, 676.) In August 2016, Dillard reported A.D.'s anxiety had been "very bad lately," to the point where it was causing vomiting. (Tr. 700-701.) Dr. Bass diagnosed anxiety and mood disorder. (Tr. 704.) The ALJ recites some of this evidence in the decision, but does not sufficiently analyze it in the context of evaluating A.D.'s degree of limitation in the specific domain of Caring for Yourself. Indeed, it is unclear whether the ALJ considered the evidence regarding A.D.'s ability to maintain a healthy emotional state (i.e., handle stress and frustration, cope with change, and maintain emotional equilibrium) as it relates to this particular domain.

The ALJ also failed to sufficiently analyze the evidence regarding a number of other behaviors relevant to self-care. As noted above, the domain of Caring for Yourself includes an assessment of a child's ability to regulate her physical needs in a healthy way and considers such

issues as whether the child refuses to take medication, responds to circumstances in safe and appropriate ways, and exhibits sleep and/or eating disturbances. Here, there is evidence A.D. exhibited significant difficulties with sleep disturbance. In April 2015, Dillard reported A.D. continued to have sleep issues, including waking up screaming and hitting the walls five nights per week. (Tr. 624.) Dr. Bass diagnosed sleep disturbance and referred her to a sleep clinic. (Tr. 626.) In August 2016, A.D. continued to have "episodes of screaming and breathing issues at night." (Tr. 695.) During the hearing, Dillard testified A.D. wakes up screaming and yelling four times per week. (Tr. 77.) The ALJ fails to address this evidence in this context of this domain. *See* SSR 09-01p (explaining that difficulty sleeping due to anxiety or hypervigilance, irritability due to lack of sleep, crying when time to leave to school are relevant to domain of Caring for Yourself).

While the Court agrees with Dillard that the ALJ's evaluation of this domain is not supported by substantial evidence, however, this does not mean she is entitled to a remand under the circumstances presented herein. As noted *supra*, to functionally equal the listings, an impairment(s) must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. *See* 20 C.F.R. § 416.926a(a); Social Security Ruling ("SSR") 09–1p, 2009 WL 296031 (February 17, 2009). Here, the Court has found substantial evidence supports the ALJ's finding that A.D. has less than marked limitation in the domain of Acquiring and Using Information, and Dillard does not challenge the ALJ's findings that A.D. has less than marked limitations in the domains of Attending and Completing Tasks, Interacting and Relating with Others, Moving About and Manipulating Objects, and Health and Physical Well-Being. Thus, even though the ALJ's finding regarding the domain of Caring for Yourself

43

is not supported by substantial evidence, a remand is not warranted because Dillard would not be able to demonstrate "marked" limitations in two domains of functioning or an "extreme" limitation in one domain.

### Sentence Six Remand

In her final assignment of error, Dillard argues she is entitled to a remand for consideration of new and material evidence. (Doc. No. 13 at 18-19.) She maintains treatment records from Signature Health demonstrate that A.D. "had been diagnosed with schizophrenia and was having significant emotional problems that interfered with caring for herself." (*Id.*) Dillard further asserts she has demonstrated "good cause" for her failure to timely present this evidence, noting she did not have legal representation at the hearing. (*Id.*)

The Commissioner argues the additional evidence cited by Dillard does not warrant a remand under Sentence Six. (Doc. No. 15 at 20-23.) She argues Dillard cannot show good cause because, although she was unrepresented, the ALJ repeatedly offered to postpone the hearing to allow her to obtain representation but Dillard nonetheless elected to proceed. (*Id.*) Moreover, the Commissioner notes the ALJ explained the contents of the disc containing the hearing evidence and Dillard did not indicate that additional Signature Health records were missing. (*Id.*) The Commissioner also argues the evidence is neither new or material. (*Id.* at 22.)

The Sixth Circuit has repeatedly held that "evidence submitted to the Appeals Council after the ALJ's decision cannot be considered part of the record for purposes of substantial evidence review." *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). A district court can, however, remand the case for further administrative proceedings in light of such evidence, if a

claimant shows the evidence satisfies the standard set forth in Sentence Six of 42 U.S.C. §

405(g). *Id. See also Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir.1996); *Lee v.

Comm'r of Soc. Sec.*, 529 Fed. Appx. 706, 717 (6th Cir. July 9, 2013) (stating that "we view

newly submitted evidence only to determine whether it meets the requirements for sentence-six

remand"). Sentence Six provides that:

> The court may ... at any time order additional evidence to be taken before the
> Commissioner of Social Security, but only upon a showing that there is new
> evidence which is material and that there is good cause for the failure to
> incorporate such evidence into the record in a prior proceeding; and the
> Commissioner of Social Security shall, after the case is remanded, and after
> hearing such additional evidence if so ordered, modify or affirm the
> Commissioner's findings of fact or the Commissioner's decision, or both, and
> shall file with the court any such additional and modified findings of fact and
> decision, and, in any case in which the Commissioner has not made a decision
> fully favorable to the individual, a transcript of the additional record and
> testimony upon which the Commissioner's action in modifying or affirming
> was based.

42 U.S.C. § 405(g) (emphasis added).

Interpreting this statute, the Sixth Circuit has held that "evidence is new only if it was

'not in existence or available to the claimant at the time of the administrative proceeding.' "

*Foster*, 279 F.3d at 357 (quoting *Sullivan v. Finkelstein*, 496 U.S. 617, 626, 110 S.Ct. 2658, 110

L.Ed.2d 563 (1990)). Evidence is "material" only if "there is 'a reasonable probability that the

Secretary would have reached a different disposition of the disability claim if presented with the

new evidence.'" *Id.* (quoting *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 711

(6th Cir.1988)). *See also Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir.2007) (noting that

evidence is "material" if it "would likely change the Commissioner's decision."); *Courter v.

Comm'r of Soc. Sec.*, 2012 WL 1592750 at * 11 (6th Cir. May 7, 2012) (same). Evidence is not

material if it is cumulative of evidence already in the record, or if it merely shows a worsening

condition after the administrative hearing. *See Prater v. Comm'r of Soc. Sec.*,235 F. Supp.3d 876, 880 (N.D. Ohio 2017). *See also Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 478 (6th Cir.2003); *Sizemore*, 865 F.2d at 712 ("Reviewing courts have declined to remand disability claims for reevaluation in light of medical evidence of a deteriorated condition"); *Deloge v. Comm'r of Soc. Sec.*, 2013 WL 5613751 at * 3 (6th Cir. Oct.15, 2013) (same).

In order to show "good cause," a claimant must "demonstrat[e] a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Foster*, 279 F.3d at 357. *See also Willis v. Sec'y of Health & Hum. Servs.*, 727 F.2d 551, 554 (6th Cir. 1984). "The mere fact that evidence was not in existence at the time of the ALJ's decision does not necessarily satisfy the 'good cause' requirement." *Courter*, 2012 WL 1592750 at * 11. Rather, the Sixth Circuit "takes 'a harder line on the good cause test' with respect to timing, and thus requires that the clamant 'give a valid reason for his failure to obtain evidence prior to the hearing.'" *Id.* (quoting *Oliver v. Sec'y of Health & Human Servs.*, 804 F.2d 964, 966 (6th Cir.1986)). This includes "detailing the obstacles that prevented the admission of the evidence." *Courter*, 2012 WL 1592750 at * 11. *See also Bass*, 499 F.3d at 513.

The burden of showing that a remand is appropriate is on the claimant. *See Foster*, 279 F.3d at 357; *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 276 (6th Cir. 2010). When a district court grants remand pursuant to Sentence Six, it "neither affirm[s] nor reverse[s] the ALJ's decision, but simply remand [s] for further fact-finding." *Courter*, 2012 WL 1592750 at * 11. *See also Melkonyan v. Sullivan*, 501 U.S. 89, 98, 111 S.Ct. 2157, 115 L.Ed.2d 78 (1991). Under these circumstances, the district court retains jurisdiction and enters final judgment only "after postremand agency proceedings have been completed and their results filed with the

court." *Shalala v. Schaefer*, 509 U.S. 292, 297, 113 S.Ct. 2625, 125 L.Ed.2d 239 (1993). *See also Melkonyan*, 501 U .S. at 98; *Marshall v. Comm'r of Soc. Sec.*, 444 F.3d 837, 841 (6th Cir. 2006).

Dillard argues a Sentence Six remand is warranted based on treatment records from A.D.'s mental health providers at Signature Health from May 2017 through November 2017. (Doc. No. 13 at 19.) These records provide as follows. On May 30, 2017 (several months prior to the administrative hearing), therapist Stacey Johnson noted A.D. presented with a guarded and flat affect and had been prescribed Zoloft and Abilify.[12] (Tr. 718, 720.) On June 14, 2017, A.D. became defensive and tearful during the counseling session. (Tr. 725.) Later that month, on June 22, 2017, A.D. presented to Dr. Bonder for follow-up. (Tr. 769-775.) Dr. Bonder found A.D.'s moderate psychosis, moderate-severe depression, and moderate anxiety had improved since starting medication. (Tr. 773-774.) Among other things, Dr. Bonder noted A.D. was less withdrawn, showing more affect, taking care of her daily living activities, "no longer sad all day," walking more with increased energy, and experiencing decreased anxiety. (*Id.*) However, she noted A.D. was still reporting hallucinations (although at a decreased rate), and continued to experience irritability and sleep disturbance. (*Id.*) On examination, Dr. Bonder noted less

---

[12] Although not cited or discussed by Dillard in connection with her Sentence Six argument, the Court notes that, on May 9, 2017, psychiatrist Dr. Bonder conducted an initial psychiatric evaluation, at which time she diagnosed major depressive disorder, recurrent, moderate; general anxiety disorder; unspecified schizophrenia spectrum disorder; and Tourette's Disorder. (Tr. 818-824.) On examination that date, A.D. was alert and oriented with guarded but "relatively" cooperative behavior, an irritable and sad mood, poor eye contact, normal speech, a restricted and tearful affect, linear and logical thought process, and limited insight and judgment. (Tr. 824.) Dr. Bonder noted that A.D. reported recent visual hallucinations of "headless bodies and bodiless heads." (Tr. 824.) Dr. Bonder prescribed Abilify and Zoloft. (*Id.*)

guarded and more cooperative behavior, better eye contact, normal speech, normal psychomotor activity, a mildly dysthymic mood, linear and logical thought process, normal thought content, fair concentration, and limited insight and judgment. (Tr. 774-775.) Dr. Bonder increased A.D.'s Zoloft and Abilify dosages. (Tr. 775.)

On June 28, 2017, A.D. returned to Ms. Johnson, at which time Dillard shared a video of A.D. crying uncontrollably. (Tr. 730.) On July 12, 2017, A.D. presented "as sad at first and tearful stating she doesn't like feeling this way and wants to be normal." (Tr. 735.) Shortly thereafter, on July 17, 2017, A.D. returned to Dr. Bonder. (Tr. 776-782.) Dr. Bonder found A.D.'s condition was largely unchanged since the last visit, despite the increase in medication. (*Id.*) She continued A.D. on her medications and referred her for counseling for Tourette's. (Tr. 782.)

On August 21, 2017 (nine days prior to the hearing), Dr. Bonder found A.D.'s depression and anxiety had improved but that her schizophrenia and Tourette's remained largely unchanged. (Tr. 787-788.) A.D. reported she "sees dogs chasing her and heads cut off on the floor." (Tr. 787.) Nonetheless, A.D.'s mood had been "good" with better motivation, energy, and appetite. (*Id.*) A.D. continued to experience frequent nightmares due to her hallucinations, as well as anxiety "related to seeing the heads." (Tr. 787-788.) Dr. Bonder continued A.D. on Zoloft, but switched her from Abilify to Seroquel. (Tr. 789.) Several days later, on August 23, 2017, Dillard reported to Ms. Johnson that A.D. was "doing well, less outbursts, less twitches, and school is starting off well," but indicated A.D. was still having nightmares. (Tr. 739.)

On September 21, 2017 (after both the hearing and the ALJ decision), Dr. Bonder found A.D.'s moderate-severe depression and moderate anxiety had improved over the last month,

noting A.D.'s "mood has been good" and her "irritability [has been] much better, no big outbursts, only about 2 small ones." (Tr. 794.) A.D. "reports no longer seeing dogs chasing [her], no longer sees the heads cut off on the floor, but sees a black dot chasing her, and has been seeing ghosts of men." (*Id.*) Dillard reported she had been "getting frequent reports from school that A.D. was laughing in the middle of class and talking to someone who is not there." (Tr. 795.) On examination, A.D. was calm and cooperative with good eye contact, normal speech, normal psychomotor activity, "okay" mood, a "euthymic, mood-congruent, full-range, smiling" affect, linear and logical thought process, normal thought content, fair concentration, and limited insight and judgment. (*Id.*) Dr. Bonder increased A.D.'s Seroquel dosage and "discussed possible Gelastic seizures with mom today because of unprovoked laughing episodes." (Tr. 796.)

The following month, Dr. Bonder noted slight improvement in A.D.'s psychosis, noting she was less paranoid and experiencing fewer hallucinations. (Tr. 801.) She also found A.D.'s depression and anxiety had improved further, but noted her "severe motor tics and verbal tics [were] unchanged." (Tr. 801-802.) Dr. Bonder again increased A.D.'s Seroquel dosage, and expressed continuing concern over possible gelastic seizures. (Tr. 803.)

On November 16, 2017, Dr. Bonder noted A.D.'s depression continued to improve and her moderate psychosis was unchanged. (Tr. 808-809.) She also found A.D.'s anxiety had worsened over the previous month due to an increased work load at school but was "still better overall." (Tr. 809.) Dr. Bonder wrote a letter to the school to lower A.D.'s work load "given significant symptoms and negative response to stress." (Tr. 810.) She continued A.D. on Zoloft, decreased her Seroquel dosage, and started her on Clonidine. (*Id.*) The following month, Dr.

Bonder found A.D.'s depression was improving, her anxiety "was improving overall but an issue related to school," and her schizophrenia was "improving but still an issue." (Tr. 817.) She also noted A.D.'s Tourette's was unchanged. (*Id.*) Dr. Bonder discontinued Clonidine and prescribed Prazosin.[13] (*Id.*)

For the following reasons, the Court finds Dillard has not demonstrated a Sentence Six remand is warranted. First, Dillard has not demonstrated some of the evidence at issue is "new." The majority of the records cited by Dillard (treatment notes from May 30, 2017, June 14, 2017, June 28, 2017, and July 12, 2017) pre-date the ALJ's August 30, 2017 decision. As noted above, the Sixth Circuit has held that "evidence is new only if it was 'not in existence or available to the claimant at the time of the administrative proceeding.' " *Foster*, 279 F.3d at 357 (quoting *Sullivan*, 496 U.S. at 626). These particular records are not "new" because (1) they were in existence prior to the ALJ decision; and (2) Dillard does not argue they were not available to her at that time.

The Court further finds Dillard has failed to demonstrate "good cause" for her failure to timely present the evidence at issue. As noted *supra*, in order to show "good cause," a claimant must "demonstrat[e] a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Foster*, 279 F.3d at 357. *See also Willis*, 727 F.2d at 554. Dillard argues her *pro se* status constitutes "good cause." (Doc. No. 13 at 18.) The

_____

[13] Although not discussed by Dillard in the argument section of her Brief, the Court notes A.D. underwent neuropsychological evauluation in February 2018, six months after the ALJ decision. (Tr. 832-840.) This testing found A.D. had a full scale IQ of 76; assessed borderline intellectual skills, language disorder, dyspraxia, deficits in executive functioning and memory, and specific learning disorder; and recommended a number of accommodations. (Tr. 837-840.)

Court disagrees. Although a Plaintiff's *pro se* status 'is relevant to the 'good cause' inquiry,' it is not, alone, sufficient to show good cause." *Defrank v. Colvin*, 2016 WL 3898441 at * 6 (N.D. Ohio July 19, 2016) (quoting *Hollon ex rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 484 (6th Cir. 2006)). *See also Anthony v. Comm'r of Soc. Sec.,* 2013 WL 6840359 at * 7 (N.D. Ohio Dec. 27, 2013); *Marok v. Astrue*, 2010 WL 2294056 at * 8 (N.D. Ohio June 3, 2010).

Dillard, however, argues that, in light of her *pro se* status, the ALJ had a heightened duty to develop the record, which she failed to meet. (Doc. No. 13 at 18-19.) For the following reasons, this argument is without merit.

In the Sixth Circuit, it is well established that the claimant—not the ALJ—has the burden to produce evidence in support of a disability claim. *See, e.g., Wilson v. Comm'r of Soc. Sec.*, 280 Fed. Appx. 456, 459 (6th Cir. 2008) (citing 20 C.F.R. § 404.1512(a)). *See also Struthers v. Comm'r of Soc. Sec.*, 1999 WL 357818 at *2 (6th Cir. May 26, 1999) ("[I]t is the duty of the claimant, rather than the administrative law judge, to develop the record to the extent of providing evidence of mental impairment."); *Landsaw v. Sec'y. of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) ("The burden of providing a complete record, defined as evidence complete and detailed enough to enable the Secretary to make a disability determination, rests with the claimant. 20 C.F.R. §§ 416.912, 416.913(d)."); *cf. Wright–Hines v. Comm'r of Soc. Sec.*, 597 F.3d 392, 396 (6th Cir. 2010) (although an "ALJ has an inquisitorial duty to seek clarification on material facts," a plaintiff, who is represented by counsel, must provide a "factual record" relating to the length of his employment when his past work was part of the record and was the basis of the initial decision to deny benefits). However, there is a special, heightened duty requiring the ALJ to develop the record when the plaintiff is "(1)

without counsel, (2) incapable of presenting an effective case, and (3) unfamiliar with hearing procedures." *Wilson*, 280 Fed. Appx. at 459 (citing *Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048, 1051–52 (6th Cir. 1983)).

Here, the Court finds Dillard has not demonstrated the ALJ had a "heightened duty" to obtain the particular records noted above and include them in the administrative record.  As an initial matter, during the July 11, 2017 hearing, the ALJ explained to Dillard her right to representation and offered (repeatedly) to postpone the hearing to allow her to obtain a representative.  (Tr. 51-52.)   Dillard declined, stating, "I'll go ahead today."  (Tr. 53.)  The record also reflects Dillard signed a waiver form on that date, indicating as follows: "I understand my right to representation at the hearing.  I voluntarily waive this right, and I request to proceed without a representative.  I also acknowledge that I received a list of organizations that provide legal services prior to receiving the Notice of Hearing."  (Tr. 157.)  Thus, the Court finds the ALJ properly advised Dillard of her right to representation and, further, to a postponement of the hearing, but Dillard clearly expressed the desire to continue without representation.

Dillard argues, however, that remand is required because she was unable to access the evidence disc that had been provided to her and was unsure of what was in the record.  (Doc. No. 13 at 19.)  She asserts she alerted the ALJ to A.D.'s Signature Health records but "no effort was made by the ALJ to assure that the record was complete." (*Id.*)  The Court disagrees with Dillard's characterization of the record with regard to this issue.  During the hearing, the ALJ asked Dillard whether she had had the opportunity to review the record, to which she responded that she had received the CD containing the record but didn't "know how to do all that stuff."

(Tr. 55.)  The ALJ then spoke with Dillard about what was in the record, going section by section through the record and explaining the nature of the documents contained therein.  (Tr. 55-56.)  The following exchange then occurred between the ALJ and Dillard:

> Q:  So that's what's contained in the record.  Do you have anything that you want to add to the record?
>
> A:  Well, the record -- I sent in paperwork from Signature Health that does show that.  I don't know if it just came from me, but I did send it in again stating, you know, what the treatments that she's having and the issues that she's been having for, you know, quite some time.
>
> Q:  We got a report from -- that's okay.  Don't -- don't worry.  We got that report from Signature Health on June 23 and it's dated June 14.  Oh, just June 14.  Does that sound right? Six pages?
>
> A:  I'm pretty sure that's what I sent in.  Did it come from me or it came from them?
>
> Q:  Oh, it isn't marked who it came —
>
> A:  Okay.  But it doesn't matter.
>
> Q:  Yeah.
>
> A:  I mean it's the same paperwork.  It's the same paperwork.  So –
>
> Q:  Okay.  And do you object to any of the records that are have been sent in?
>
> A:  No . . .

(Tr. 56-57.)

Thus, the ALJ explained the content of the record to Dillard and, in fact, expressly addressed her concern as to whether it contained A.D.'s Signature Health records.  The ALJ only identified one such record (dated June 14, 2017), but Dillard failed to alert the ALJ to the existence of any of the other pre-hearing Signature Health records that she now relies on; i.e., the treatment notes dated May 9, 2017, May 30, 2017, June 22, 2017, June 28, 2017, July 12, 2017,

53

July 17, 2017, August 21, 2017 and August 23, 2017.  Under these circumstances, the Court

cannot find the ALJ failed in her duty to develop the record.  *See Daniels v. Colvin*, 2016 WL

4543473 at * 6 (E. D. Mich. Aug. 1, 2016), *report and recommendation adopted*, 2016 WL

4525276 (E.D. Mich. Aug. 30, 2016) (denying Sentence Six remand where "the ALJ asked [the

*pro se* claimant] during the hearing whether there was any other evidence that existed, and she

said there was not."); *Brown v. Berryhill*, 2018 WL 3548843 at *25 (N.D. Ohio July 24, 2018)

(same).

Finally, the Court finds Dillard has not demonstrated the evidence at issue is "material."

While she summarizes (some of) the Signature Health records, Dillard fails to sufficiently

articulate why she believes they "would likely change the Commissioner's decision."  *Bass*, 499

F.3d at 513.  Indeed, aside from generically stating the evidence is relevant to the domains of

Caring for Yourself and Acquiring and Using Information, Dillard offers no meaningful

argument demonstrating "there is 'a reasonable probability that the Secretary would have

reached a different disposition of the disability claim if presented with the new evidence.'"[14]

*Foster,* 279 F.3d at 357.   Moreover, much of the evidence arguably demonstrates A.D. was

slowly improving with regular treatment and medication, particularly with respect to her

depression and anxiety.  (Tr. 773-774, 787-788, 739, 794, 801-802, 808-809, 817.)  Even with

regard to her schizophrenia, Dr. Bonder noted some improvement along with a decrease in

paranoia and hallucinations.  (Tr. 817.)

---

[14] The Court notes that Dillard makes no argument regarding the results of A.D.'s
neuropsychological evaluation in the context of the domain of Acquiring and Using
Information.  Thus, the Court deems that issue waived and does not address it herein.

Accordingly, and for all the reasons set forth above, the Court finds Dillard has failed to carry her burden of demonstrating a Sentence Six remand is warranted.  Dillard's third assignment of error is without merit.

## VII.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**


 _s/Jonathan D. Greenberg_
Jonathan D. Greenberg
United States Magistrate Judge

Date: May 6, 2019